UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STEVEN E. MULLEN,
                                        Plaintiff,
              v.                                              5:06-CV-759
                                                              (GJD)
COMMISSIONER OF SOCIAL SECURITY,
                                        Defendant.
_____

JOHN L. BARDSLEY, ESQ., Attorney for Plaintiff
KAREN G. FISZER, ESQ., Special Asst. U.S. Attorney for Defendant

GUSTAVE J. DIBIANCO, Magistrate Judge

## MEMORANDUM DECISION AND ORDER

This matter has been referred to me for all further proceedings, including the

entry of judgment pursuant to 28 U.S.C. § 636(c), the consent of the parties, and the

order of Chief United States District Judge Norman A. Mordue dated May 15, 2007.

(Dkt. No. 16).

## PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability insurance benefits on

June 28, 2004.  (Administrative Transcript ("T") at 62-65).  The application was

denied initially, and a request was made for a hearing.  (T. 29-33).  A hearing was

held before an Administrative Law Judge ("ALJ") on September 8, 2005.  (T.

378-401).  In a decision dated November 17, 2005, the ALJ found that plaintiff was

not disabled.  (T. 12-24).  The ALJ's decision became the final decision of the

Commissioner when the Appeals Council denied plaintiff's request for review on

April 27, 2006.  (T. at 6-9).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ failed to provide specific reasons for the weight given to the medical opinion of plaintiff's treating physician.  (Brief, pp. 9-10).

(2) The opinion offered by plaintiff's treating physician should have been given controlling weight.  (Brief, pp. 7-9).

(3) Plaintiff should be found disabled based on substantial evidence that he cannot perform all of the requirements of sedentary work.  (Brief, pp. 1, 10).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record, and must be affirmed.

## FACTS

**A.**   **Non-Medical Evidence and Testimony:**

Plaintiff, who was forty-one years old at the time of the ALJ's hearing, completed the eighth grade.  (T. 382, 384).  Plaintiff last worked as a dairy herd manager and has a total of twenty years of farming experience.  (T. 82, 108, 384).  Plaintiff testified that while working on October 21, 2003, he pushed on a cow and experienced a "sharp" pain in his lower back.[1]  (T. 392).  He stated that he was unable to return to work after the incident.  (T. 384, 391).

At the hearing, plaintiff testified that he is unable to work due to pain in his

---

[1]  In a report prepared by Dr. Stephen Lebduska, an examining physician, it was noted that plaintiff described the incident as occurring when he "attempt[ed] to push a cow into a 'headlock' in order to immobilize her for some injections."  (T. 310).

left leg and lower back, as well as arthritis in his knees and feet.  (T. 386, 387).

Plaintiff stated that he experiences a "real sharp pain" in his lower back that radiates

down his left leg.  (T. 394).  He testified that his feet and knees "constantly ache and

burn."  (T. 394).  Plaintiff stated that he previously had several surgeries on his legs,

but was able to return to work after the surgeries.  (T. 394, 395).

With regard to his daily activities, plaintiff testified that his day consists of

lying down, watching television, and sitting.  (T. 388).  He stated that he lives on the

first floor of his house because using stairs "bothers" him and because he "kept

falling down the stairs."  (T. 391).  He stated that he is no longer able to perform

housework, cook, garden, fish, and take care of animals.  (T. 393, 396-398).  He

stated that he uses a cane.  (T. 389).  He estimated that he drives every two weeks for

a monthly total of thirty miles, and drives only to visit doctors.  (T. 388, 398).  He

also stated that he goes shopping with his wife once or twice a month and uses a

wheelchair when shopping.  (T. 388, 393).

When asked about his physical capabilities, plaintiff estimated that he can lift

and carry up to ten pounds occasionally, walk about fifty feet, stand for ten minutes,

and sit between thirty to sixty minutes.  (T. 390).  Plaintiff stated that he is limited in

his abilities to push and pull.  (T. 399).  He also stated that he is unable to tie his

shoes and put on socks, but is able to take care of personal hygiene.   (T. 388).  He

further stated that he while he is able to open and close a car door, doing so "bothers"

3

his lower back.  (T. 400).

**B.**   **Medical Evidence**

    **1.**   **Treating Sources**

        **a.**   **Cayuga Medical Center**

After sustaining the injury on October 21, 2003, plaintiff sought treatment the next day at the emergency room of Cayuga Medical Center.  (T. 196-205). Treatment notes reflect a marked decrease in range-of-motion of plaintiff's back and marked muscle spasm with lumbar scoliosis.  (T. 197).  Plaintiff was diagnosed as suffering from acute lumbar myofascial strain and discharged the same day.  (T. 197).

On December 23, 2003, Plaintiff returned to the Cayuga Medical Center with complaints of pain in his back and legs, weakness in the legs, and incontinence.  (T. 177).  An MRI of plaintiff's lumbar spine showed a "loss of normal signal in the L4-5 disc" and "minimal" posterior disc bulging at L4-5 and L5-S1.  (T. 187).  The MRI report also stated "IMPRESSION: NO EVIDENCE OF ACUTE PATHOLOGY." (T. 187).  Plaintiff was diagnosed as suffering from back pain with leg pain and weakness, as well as detrusor instability.  (T. 182, 185).  Upon plaintiff's request, he was discharged the following day.  (T. 182, 185).

        **b.**   **Dr. Michael Niziol**

Plaintiff was treated by Dr. Michael Niziol from October of 2003 to August of

2005.  (T. 136-68, 332-25, 329-30, 336-37).  Dr. Niziol diagnosed plaintiff as

suffering from lumbar radiculopathy and prescribed various pain medications.  (T.

136-39, 144, 147, 158).  An earlier MRI of plaintiff's lumbar spine performed on

November 17, 2003 at Cortland Memorial Hospital showed a slight left paracentral

disc protrusion at L5-S1, but "otherwise normal alignment and position with no other

significant findings identified."  (T. 163).

On November 24, 2004, Dr. Niziol completed a form entitled "Medical Source

Statement of Ability to do Work-Related Activities (Physical)."[2]  This form indicates

that plaintiff could lift and carry "small objects" occasionally; could stand and walk

using a cane, but was unable to walk for any significant time periods; could sit for

"probably" four hours a day with frequent change in position; and could push and

pull to a limited extent using his lower extremities.  (T. 322-23).  Dr. Niziol also

indicated that plaintiff could occasionally reach and handle; and could have only

limited exposure to vibration and hazards.  (T. 323-25).

In a letter to plaintiff's counsel dated April 5, 2005, Dr. Niziol opined that

plaintiff was

> fairly severely disabled as a result of this accident . . ..  He is unable to
> return to his usual duties as a cow herdsman and certainly cannot
> resume any other type of farm work . . .    As to whether he can do
> light duty or not, that would be very difficult.

---

[2]  The court notes that this document is a form in which the doctor indicates a claimant's
physical limitations by checking the appropriate boxes on the form.  This form is often referred
to as a Residual Functional Capacity (RFC) evaluation.

Dr. Niziol stated that plaintiff was in "fairly constant pain," and "requires constant change of position."  (T. 329-330).

### c.    Michael Kennedy, D.C.

Plaintiff saw Michael C. Kennedy, a chiropractor, on twenty-five occasions from December of 2003 to September of 2004.  (T. 174).  Dr. Kennedy diagnosed plaintiff as suffering from lumbar disc syndrome and left sciatic nerve irritation.  (T. 174).  He opined that plaintiff was temporarily totally disabled.  (T. 174).

### d.    Dr. Ralph Ortiz

Dr. Niziol referred, plaintiff to Dr. Ralph Ortiz, a Doctor of Osteopathy, at Medical Pain Consultants, Inc.  Plaintiff saw Dr. Ortiz every one to two weeks from May of 2004 to September of 2005.  (T. 140, 219-242, 338-371).  Dr. Ortiz prescribed various pain medications and treated plaintiff with nerve stimulation and trigger point injections/neural blocks, which plaintiff tolerated well, resulting in decreased pain, increased range-of-motion, and improved gait.  (T. 219-242, 338-371).  In Workers' Compensation forms, Dr. Ortiz regularly stated that plaintiff had lumbar "sprains and strains with myalgia, and myositis" and was totally disabled.  (T. 219-242, 338-371).

### 2.    Examining Sources

### a.    Dr. Daniel Carr

Plaintiff underwent several independent medical examinations by Dr. Daniel

L. Carr, a Board Certified orthopedic physician.  Plaintiff first saw Dr. Carr on December 18, 2003.  (T. 170-73).  Dr. Carr found it "incredibl[e]" that plaintiff had no treatment for his condition since physical therapy was the "staple of treatment" for plaintiff's condition.  (T. 172).

Dr. Carr stated that:

The worst thing he could be doing would be staying totally sedentary like he is doing at the current time.

I would recommend . . . physical therapy three times a week for six weeks.

He has not reach maximal medical improvement . . . further treatment is necessary.  His treatment to date has not been reasonable and necessary in the respect that he has had almost no treatment.

In my opinion, patient could resume light duty work . . . with no lifting while bent at the waist and the ability to frequently change positions . . . An overall lifting restriction of twenty pounds would be appropriate.  He currently has a moderate, partial disability by the Workers' Compensation Guidelines.

(T. 172).

Plaintiff was reexamined by Dr. Carr on February 23, 2004.  (T. 210-13).  Dr. Carr stated that plaintiff's "range of motion of his lumbar spine is limited in all directions moderately by pain."  (T. 211).  Dr. Carr found that plaintiff "has positive distraction testing with flip test and straight leg raise."  (T. 211).  Dr. Carr examined medical records from other physicians including records from Dr. Stackman dated December 24, 2003.  Dr. Stackman questioned the etiology for plaintiff's leg

complaints, and Dr. Carr concluded that

> I would agree with . . . Dr. Stackman that there is a question as to how much of his symptoms have any organic basis.
>
> He has lumbar degenerative disc disease and a small left L5-S1 paracentral disc bulge versus protrusion.  These organic findings on MRI do not explain his subjective complaints and there is significant non-organic overlay.

(T. 212).  Dr. Carr once again stated that "in my opinion he could return to work in a light duty capacity in an overall lifting restriction of twenty pounds, no lifting while bent at the waist, and the ability to frequently change positions."  (T. 212). Dr. Carr found that plaintiff's chronic low back pain and left lower extremity symptoms were of "questionable" etiology, the organic findings on MRI did not explain his subjective symptoms, and there was significant non-organic overlay.  (T. 212).

Dr. Carr opined that plaintiff could "return to work in a light duty capacity" with restrictions of lifting less than twenty pounds and no lifting while bent at the waist, and with the ability to change positions frequently.  (T. 212).  Dr. Carr also noted that he saw no "medical indication" for a cane.  (T. 212).  Dr. Carr found that plaintiff had a mild degree of disability by the Worker's Compensation Guidelines. (T. 212).  Dr. Carr found that plaintiff had a "mild degree of disability by the Workers' Compensation Guidelines."  (T. 212).

Dr. Carr reexamined plaintiff on June 21, 2004.  (T. 244-46).  He noted that

plaintiff's subjective complaints "continue to be out of proportion to objective findings." (T. 245). Dr. Carr reviewed records from Dr. Shende dated January 13, 2004 in which Dr. Shende recommended physical therapy for plaintiff's condition. Dr. Shende also stated that plaintiff's pain syndrome seemed to be disproportionate to clinical findings. (T. 245). Dr. Carr stated that "in general, I agree with the consulation from Dr. Shende that the patient's problem is largely a pain problem." (T. 245). Dr. Carr found no "specific orthopedic abnormality other than his degenerative lumbar disc disease." (T. 245). He found that plaintiff could return to his past work as an assistant herdsman with no restrictions. (T. 246).

### b. Dr. Michael Shende

Dr. Niziol also referred plaintiff to Dr. Michael Shende, a neurosurgeon and Clinical Professor of Neurosurgery, who examined plaintiff on January 13, 2004. (T. 206-208). Dr. Shende reviewed the November 2003 MRI of plaintiff's lumbar spine and found no "compromise of any neural structures" and "no disc herniation." (T. 207). He found that the "clinical picture and the MRI findings do not call for any surgical intervention" and that plaintiff's pain "seems to be a bit disproportionate to the clinical findings and the MRI findings." (T. 208).

### c. Michael Giordano, D.C.

On April 28, 2004, plaintiff underwent an consultative examination by Michael A. Giordano, D.C. (T. 214-217). Dr. Giordano found that plaintiff's

9

condition "appears to be out of proportion to objective findings." (T. 217). He

diagnosed plaintiff as suffering from lumbar facet syndrome and left radiculopathy.

(T. 216).

Dr. Giordano reexamined plaintiff on August 3, 2004. (T. 250-254). He

found that plaintiff's "reported pain appears to have a subjective component with

limited objective signs." (T. 253). He found that plaintiff was capable of performing

part-time "sedentary" work with limited bending and lifting only five pounds. (T.

253). On November 18, 2004, plaintiff was reexamined by Dr. Giordano. (T. 301-

305). Dr. Giordano found that plaintiff exhibited "extreme symptoms without much

objective support" and that plaintiff was capable of performing part-time "sedentary"

work. (T. 304).

### d.   **Dr. Jody Stackman**

Plaintiff was examined by Dr. Jody Stackman, a neurologist, on July 16, 2004.

(T. 247-49). Dr. Stackman diagnosed plaintiff as suffering from chronic low back

pain, but noted that "[a]s in the past," the organic etiology of his complaints remains

"elusive." (T. 248-49). Dr. Stackman recommended a trial of "some physical

therapy and consider continued analgesic supplemented by [medications]." *Id.*

### e.   **Dr. John Cusick**

At the agency's request, Dr. John Cusick examined plaintiff consultatively on

August 5, 2004. (T. 258-63). Dr. Cusick found normal flexion in plaintiff's cervical

spine, equal reflexes in plaintiff's upper extremities with difficulty in plaintiff's range of motion in his shoulders.  Dr. Cusick believed that plaintiff's resistance to his shoulder range of motion "appears voluntary."  (T. 261).  Dr. Cusick found no spinal tenderness, no spasms, no scoliosis, and no evidence of back pain in plaintiff's lumbar spine using straight leg-raising tests.

Dr. Cusick stated:

Based upon the objective findings in today's examination, the claimant is amplifying his symptoms to a degree best illustrated by the discordant results on straight leg raising.  I conclude that claimant has a moderate limitation for standing, walking, bending and lifting and mild limitation for prolonged sitting.

(T. 262).

### f.   Dr. Stephen Lebduska

On August 7, 2004, Plaintiff was examined by Dr. Stephen Lebduska for a physiatric independent medical examination.  (T. 264-72).  Dr. Lebduska is an assistant professor of physical medicine and rehabilitation associated with the State University Hospital and Medical Center in Syracuse .  His report is more than eight single spaced pages, and includes a thorough review of plaintiff's history, current symptomatology, medications, and review of twenty separate types of plaintiff's past medical records.  Dr. Lebduska performed a thorough physical examination (T. 269-70), and diagnosed plaintiff as having chronic myofascial low back pain and mild left-sided S1 radiculopathy.  (T. 270).  Dr. Lebduska concluded that the plaintiff

11

"*clearly manifest[s] significant symptom magnification and . . . there is clearly a major nonorganic overlay*" [emphasis added].  (T. 270).  Dr. Lebduska opined that plaintiff was not capable of variable or heavy-duty farm work, but was capable of performing "sedentary work activity" that allowed him to change positions and sit or stand intermittently.  (T. 271).  On November 19, 2004, plaintiff was reexamined by Dr. Lebduska.  (T. 310-20).  He found that plaintiff was capable of performing "sedentary" work activity that allowed him to change positions and sit or stand "periodically."  (T. 319).

### g.   Dr. Saeed Bajwa

Plaintiff was evaluated by Dr. Saeed Bajwa, a neurosurgeon, on November 15, 2004.  (T. 306-308).  Dr. Bajwa diagnosed plaintiff as suffering from left L5 radiculopathy, secondary to "what seems like herniated lumbar disc at left L5-S1." (T. 308).  An MRI performed on February 4, 2005 showed a left paracentral disc protrusion at L5-S1 and a mild disc bulging at L4-L5.  (T. 164).  Dr. Bajwa reviewed the MRI, noting that the "most significant finding" was the "annular tear at left L5-S1" and that the "far lateral herniated lumbar disc in the neural foramen [did] not seem to be as impressive after review."  (T. 327).

### h.   Dr. Susan Cowdery

On April 14, 2005, plaintiff underwent a nerve conduction study performed by Dr. Susan Cowdery.  (T. 331-333).  The study was "normal" and Dr. Cowdery found

"no electrophysiologic evidence" of a left L2-S1 radiculopathy.  (T. 333).

## DISCUSSION

### 1.     <u>Disability Standard</u>

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities.
If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without

considering vocational factors such as age, education, and work experience; . . . . Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step.  *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.   <u>Scope of Review</u>

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence.  *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *William*s, 859 F.2d at 258.  However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

3.    **Treating Physician**

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and ***not inconsistent with other substantial evidence***.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 416.927(d).  If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is not required to give the opinion controlling weight.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must, however, properly analyze the reasons that the report is rejected.  *Id.*  An ALJ may not arbitrarily substitute his own judgment for competent medical opinion.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

If the treating physician's opinion is not given controlling weight, the ALJ must assess the following factors: the length of the treatment relationship; the frequency of examination for the condition in question; the medical evidence supporting the opinion; the consistency of the opinion with the record as a whole; the qualifications of the treating physician; and other factors tending to support or contradict the opinion.  20 C.F.R. §§ 404.1527(d)(2)-(d)(6); 416.927(d)(2)-(d)(6).  Failure to follow the proper standard is a ground for reversal.  *Barnett v. Apfel*, 13 F. Supp. 2d 312, 316 (N.D.N.Y. 1998)(citation omitted).

In this case, plaintiff argues that the ALJ should have afforded controlling weight to the opinion of his treating physician, Dr. Niziol, who completed the

November 2003 RFC evaluation.[3]  (T. 322-25).  He also argues that the ALJ failed to provide specific reasons for the weight afforded to the opinion.

The ALJ found that the RFC evaluation was entitled to "limited weight," explaining that Dr. Niziol is a family practitioner; his opinions were not well supported by objective findings; his office notes were "very cryptic" and unsupportive of his conclusions; and his findings were inconsistent with the findings and conclusions of the examining consultants, who are specialists.  (T. 21).  The ALJ specifically reviewed the evidence from the other physicians **and** specifically stated why he gave the other reports significant weight.  *See* T. 19-21.  The ALJ also pointed to substantial evidence in the reports which contradicted Dr. Niziol's opinion.  (T. 21).  For the following reasons, the court finds that the ALJ's conclusion was both properly explained and supported by substantial evidence.

First, Dr. Niziol's RFC assessment was not well supported.  The assessment itself offers little in the way of supporting evidence.  In the assessment, when asked to state the medical/clinical findings supporting plaintiff's exertional limitations, Dr. Niziol simply stated "severe lumbar radiculopathy."  (T. 323).  Also, when asked to state the evidence supporting plaintiff's postural, manipulative, and environmental

---

[3]  As previously noted, Dr. Niziol indicated that plaintiff could lift and carry "small objects" occasionally; could stand and walk using a cane, but was unable to walk for any significant time periods; could sit for approximately four hours a day with frequent change in position; and could push and pull to a limited extent using his lower extremities.  (T. 322-23). Dr. Niziol also indicated that plaintiff could occasionally reach and handle; and could have only limited exposure to vibration and hazards.  (T. 323-25).

limitations, Dr. Niziol provided no responses.  (T. 323-24).

Plaintiff's counsel argues that Dr. Niziol's assessment is well supported, primarily citing the February 2005 MRI.  (Brief, pp. 8-9).  He argues that the MRI renders Dr. Niziol's assessment "more reliable."  (Brief, p. 8).  He points to the finding in the MRI report that a disc protrusion was contacting the existing nerve root and argues, without citing medical or other authority, that the finding is "consistent" with his "severe antalgic gait," and inabilities to sit or stand for "long periods."  (Brief, p. 8).

The RFC evaluation gives no indication of these specific alleged limitations. Rather, Dr. Niziol simply indicated that plaintiff's abilities to stand and walk were "affected" by his impairment, that he uses a cane, and that he was able to sit for "probably" *four* hours a day with frequent change in position.  (T. 322-23). Accordingly, plaintiff fails to explain how any *specific findings* in the February 2005 MRI support any *specific findings* in the RFC evaluation.[4]

Second, Dr. Niziol's progress notes do not support his RFC evaluation.  His notes show limited physical examination findings.  Moreover, on certain visits when "motor" examinations were performed, Dr. Niziol found that the results were "unreliable" due to plaintiff's pain.  (T. 136, 137, 141, 147, 152, 158).  The progress

---

[4]  Plaintiff also argues that the February 2005 MRI "reconcil[es]" inconsistencies in the record.  (Brief, p. 9).  However, plaintiff's argument is unclear and he does not clearly explain what inconsistencies in the record were reconciled by the MRI.

notes also show that from April to September of 2004, Dr. Niziol primarily observed plaintiff because Dr. Niziol did "not have much left to offer him" and recommended that plaintiff continue treating at the Pain Clinic.  (T. 152-162).  Further, in July 2004, Dr. Niziol noted his uncertainty as to part of plaintiff's condition, stating that he was "unsure if the neuropathy [in plaintiff's feet] is related to the diabetes or his chronic back problems."  (T. 159).

Third, the RFC evaluation, which was rendered in **November of 2004**, was contradicted by other substantial evidence in the record.  Dr. Lebduska, a specialist and Assistant Professor of Physical Medicine,who examined plaintiff in **August and November of 2004**, found that plaintiff "clearly manifest[s] significant symptom magnification" and opined that plaintiff was capable of performing "sedentary work activity" as long as he could change positions and sit or stand periodically.  (T. 270, 271, 319).  Moreover, Dr. Cusick, the state Agency consultant, found in **August of 2004** that plaintiff was "amplifying his symptoms to a degree" and that plaintiff was limited only moderately in his abilities to stand, walk, bend, and lift, and was limited only mildly in his ability to sit for prolonged periods.  (T. 262).  Moreover, Dr. Carr, a Board Certified orthopedist, who last examined plaintiff in **June of 2004** found that plaintiff's "subjective complaints continue to be out of proportion to objective findings."  (T. 245).  Dr. Carr found that plaintiff's condition was "largely a pain problem" and that there was no "specific orthopedic abnormality other than his

19

degenerative lumbar disc disease."  (T. 245).  He opined that plaintiff needed no

further orthopedic treatment and could return to his past work as an assistant

herdsman with no restrictions.  (T. 246).

Fourth, Dr. Niziol was a family practitioner.  Under the regulations, generally

"more weight is given to the opinion of a specialist about medical issues related to

his or her area of specialty than to the opinion of a source who is not a specialist."

20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5).  Therefore the ALJ did not err by

considering Dr. Niziol's lack of specialization when assigning less than controlling

weight to his opinion.

The ALJ's opinion clearly shows the weight assigned to the various medical

examiners.  It is clear that the examinations by the experts in orthopedics,

neurosurgery,  and physical medicine carry more weight than opinions from

plaintiff's treating physician, who was a family physician.  Many of these specialists

expressed clear doubts about plaintiff's credibility and expressly mentioned

magnification of symptoms.

Contrary to plaintiff's argument, the ALJ did express specific reasons for

affording greater weight to the other physicians.  (T. 21).  In sum, the ALJ's

assignment of less than controlling weight to Dr. Niziol's RFC evaluation was

proper.  The finding was both properly explained and supported by substantial

evidence.

**4.**     **Residual Functional Capacity**

In rendering a residual functional capacity (RFC) determination, the ALJ must

consider objective medical facts, diagnoses and medical opinions based on such

facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of

other limitations.  20 C.F.R. §§ 404.1545; 416.945.  *See Martone v. Apfel*, 70 F.

Supp. 2d 145 (N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183

(N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of

performing, and may not simply make conclusory statements regarding a plaintiff's

capacities.  *Verginio v. Apfel*, No. 97-CV-456, 1998 WL 743706, at *3 (N.D.N.Y.

Oct. 23, 1998); *LaPorta*, 737 F. Supp. at 183.

In this case, the ALJ found that plaintiff retains the RFC to lift, carry, push,

and pull ten pounds occasionally, and less than ten pounds frequently; stand and

walk forty-five minutes at a time for a total of two hours in an eight-hour workday;

and sit for one hour at a time for a total of six hours in an eight-hour workday.  (T.

23-24).  He also found that plaintiff was unable to climb ladders or scaffolding, or

crawl, and should avoid heights and moving machinery, but was able to balance,

stoop, kneel, and crouch occasionally.  (T. 22).

Plaintiff apparently argues that he should be found disabled due to his limited

abilities to sit and lift.  (Brief, p. 10).  Plaintiff states that he is unable to sit for a total

of "at least" six hours in an eight-hour workday and that he is unable to lift ten

21

pounds.  (Brief, p. 10).

To the extent that plaintiff relies on Dr. Niziol's functional assessment, the court has already found that the ALJ properly afforded less than controlling weight to that assessment.  Moreover, Dr. Niziol gave no specific indication that plaintiff was unable to lift ten pounds.  (T. 322).

The remaining medical findings do not provide substantial support for the alleged limitations.  For instance, Dr. Lebduska found that plaintiff was capable of performing "sedentary work activity" as long as he were afforded the ability to change positions and sit or stand periodically.  (T. 319).  Similarly, Dr. Cusick found that plaintiff was capable of handling objects and had only a *moderate* limitation for lifting and a *mild* limitation for prolonged sitting.  (T. 262).  Moreover, Dr. Carr found that plaintiff was able to return to work as an assistant herdsman with *no restrictions whatsoever*.  (T. 246).

Additionally, plaintiff's claim is further belied by his testimony at the hearing. Plaintiff stated that he was able to lift and carry *ten pounds* on an occasional basis, which was defined as three hours or less during a day.  (T. 390).  Thus, the ALJ's RFC finding is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and the complaint is **DISMISSED**.

Dated: August 31, 2007

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

23